Appellant Starnes is before this court requesting a remand for trial on the merits. It is Appellant Starnes' position that a jury should consider the merits of her FLSA anti-retaliation claim, her emotional distress claim under the FLSA, as well as her Texas anti-retaliation claim. These are the three main points of my argument that I hope to make this morning. Turning to protected activity under her FLSA anti-retaliation claim, the district court erred in granting a summary judgment on her anti-retaliation claim because there were genuine issues of material fact with regard to both protected activity and as to causation. With regard to protected activity, the evidence in the record affirms that she complied with or met this court's test for protected activity as given in Hagan v. Echo Star. The record... Let me just ask you one thing about her new job description. When did she get that? She received that and signed that on March 11 of 2011. She signed it then, but when did she receive it? I don't know that the evidence in the record points out when she received it originally. I don't think there's any evidence to show when she received it originally. The job description does have a date of October of 2010, I believe, as when it began to be originated, which is consistent with when Appellant Starnes first reported and complained about Daybreak's FLSA violations. The document was not presented to her until March of 2011, and that's why we call it the after-the-fact job description. Is there a dispute among the parties about when it was given to her when she received it? I would imagine there is. I don't believe... Didn't the judge think that she received it before the complaint? I think they have asserted that. I don't believe there's any evidence to support that, but I do think they have asserted that. But in any event... What evidence? I think you just said March of 2011. That's when you think she got it? That's when she signed it, and I think that's when she got it for the first time. What evidence can you point to that shows she received it after the time in which she complained about Estrada's wage situation? The job description, the after-the-fact job description itself with her signature on it in March of 2011. But you're saying we don't know when she got it. I don't know when she got it. I don't know when she got it. But I think that it was not effective until she signed it. The one... Did the job description itself say that, that this would be effective when she signs it? Or where do you get the idea that it had to be signed before it was effective? Well, I don't know that it says that. I can look at it. I have it at the council table, and I can address that later if need be. But traditionally, when you sign the job description, that is when it is effective. Well, of course, the employer could give an employee a job description any time he wanted to, couldn't he? I suppose an employer could. I think that then that would make the reason for her signing the job description superfluous. If Daybreak's position is that the job description was, in effect, prior to that, then why did they have her sign it in March of 2011? Well, if you could just acknowledge it, I mean, it could be an acknowledgement, couldn't it? Well, it may could. But looking under the summary judgment rules, looking at this fact in the light most favorable to Starnes, I think the court would have to look at this as an after-the-fact job description given to her in March of 2011. And if we're going to look at the facts in the light most favorable to Starnes, which I think the court has to do. So does the job description necessarily control, or is it what she actually was doing? I'll give you an example. There was, after Enron hit Houston, half the lawyers in town put on their website that they did white-collar crime because that became the hot thing. I can tell you, most of them I looked at, because that was my practice area, didn't do that. They just were promoting themselves. I mean, does it matter what the description or what someone's resume says? I mean, it's certainly relevant, but what if that's inconsistent with what they actually did on a daily basis? I think that is exactly right. And the facts in this case show that regardless of what the job description said or says, she did not deal with FLSA issues. The overwhelming facts in the record show that FLSA issues was within the province of the HR department, not Starnes' risk management department. And I think in the reply brief, we point out that the appellee has been able to come to this court and point out to this court no evidence of Starnes actually dealing with an FLSA issue. If that was within her scope, then there should be evidence of that fact. Did she deal with any other, say, violations of law? Yes, sir. She dealt with, she was basically a claims adjuster for the company for their non-subscriber workers' compensation claims. She also dealt with Title VII claims. But claims regarding employee compensation were within the exclusive province of the HR department. And that's why, when you look at the facts in this case, everyone suggested, the initial suggestion by everybody to Ludovina Estrada was you need to take this up with HR. You need to report this to Andy Shelton of HR. What is the evidence, I'll cut you off, what is the evidence of why Ludovina Estrada went to Starnes? What does she say, Ms. Estrada says, is the reason she went to Starnes? That is in her affidavit testimony, which is one of the record excerpts, I believe it is number six, under tab six. What Ludovina Estrada said is that she went to Starnes because Starnes was her friend and also because she felt like the partners of the organization respected Starnes. Ludovina Estrada was concerned about retaliation from the very beginning because of her experience working at that company and went to Starnes because she felt like that if there was anyone in the company who had a chance of not being retaliated against, it would be Leanne Starnes. That was proved wrong. Of course, I suppose she did have Title VII retaliation cases, I suppose, did she not? The evidence in the record is that she handled Title VII cases, discrimination cases, and she did have that within her job scope. With regard to what Leanne Starnes reported and whether it meets the Hagen standard, the court needn't look any further than the Apollese pleading admissions because in Hagen, this has nothing in the facts to suggest that Hagen was personally advocating on behalf of his technician's statutory rights. As opposed to this case where if the court looks at paragraphs 48 and 49 of Daybreak's answer, Daybreak admitted that Starnes approached the Human Resources Director Shelton and reported Daybreak's ongoing violation of the FLSA. She reported that with regard to Estrada's husband. They also admitted that Starnes also reported to Shelton that Daybreak was violating the FLSA with regard to several other employees in the maintenance crew and at the corporate office who had been wrongfully classified as exempt employees. Starnes' quote in her affidavit is, among others, that y'all are violating the law by the way you're paying Vincent. And so she advocated on behalf of the Estrada family and the court can look at even the district court's opinion noted that fact, that his review of the evidence confirmed that Starnes' advocacy was not on behalf of Daybreak, not on behalf of her employer, but on behalf of the Estradas. Excuse me, you may be relying on Hagen too much. Hagen dealt with a certain set of facts. And we said, two members of this panel agreed with it, but we didn't write the opinion. Hagen's entire claim turns on whether or not his behavior constitutes filing a complaint. And there we determined that he was not. The issue seems to me in this case more is not whether a complaint was being raised with the company, but whether that was part of her job. And so it's not a direct fit with Hagen. Would you agree at least to that extent, even if you say it's applicable because that's not part of her job, but isn't that really the issue here? It's not the Hagen issue. It's whether this was part of her job. Well, that was part of the Hagen analysis as well. Well, but that, but it's not a matter of whether, well, regardless, it is a matter of terminology it seems to me, but the fact question here is different than Hagen in that there it seems to me he was disinterested in the arguments being made. He didn't think what was done on changing the hours was illegal in Hagen. But here we have, it seems to me, a different factual situation, and it really is a matter of her job description. Well, this court pointed out in Hagen that the calculation of Hagen's technician's overtime was part of his job. That was part of this court's analysis in the Hagen case. And I respectfully submit that Hagen, we have basically the opposite situation that we have in Hagen, plus there is a factual dispute as to the scope of her job duties. And the evidence . . . How large was this office where she worked? How many people worked in it? I cannot recall how many people worked in the office itself. I think probably around 20. It's . . . I know the address, but I don't know how many people worked there. Did you get people out in the field, too? Yes, sir. They had approximately 5,000 employees throughout Texas in nursing homes scattered throughout Texas. And that was . . . Was she in a department? Well, she was risk manager, and she had a subordinate. That was the subordinate that Michael Rich used to pass the message to Ludi Estrada that instigated the December 9 showdown between Rich and Estrada. And this was a totally different department from HR? Yes, sir. A different department from HR, which is why it was HR. For example, I think if the Court looks at another admission made by Daybreak in its pleading in paragraph 51, defendants admit that Leigh Ann discussed the payment of overtime with Michael A. Rich, President Rich. Defendants admit that Michael A. Rich was frustrated that Human Resources had not previously discovered the problem on its own initiative. President Rich was looking to Human Resources to discover this problem, apparently. Human Resources was tasked with that role, and Human Resources failed, and it was Leigh Ann Starnes who brought this originally to the attention of Human Resources when she advocated against Daybreak on behalf of the Estradas. What was the idea of giving her this new job description? I mean, was this a complete change in her job, or was it just a modification of it? I mean, were they taking authority away from HR and giving it to her, or what? No, sir. It is, I think, a reverse-engineered job description to be used as a defensive weapon in this case, in an expected retaliation case, because it is a dramatic expansion of her job duties. She was required and tasked with the responsibility of reporting to President Rich all state and federal violations of law, or anything relating to state and federal violations of law, so she would have to know all state and federal law in order to fulfill her job description. The job description on its face, I think, is preposterous, because no person could do that. What about her lack of involvement for the final year of this? I mean, she goes, she helps report it, but then she's not involved anymore, and Estrada is really dealing with folks when this comes up. How does that impact the analysis? I don't think it impacts the analysis with regard to causation, because we have all three types of causation. I mean, on the protected activity, how does it impact, whether she just, you know, part of my job, it's my job to carry on these complaints, and I did that, and now I'm done. Versus, she wasn't continually pressing this issue, right? I mean, she really only brought it up once herself. She brought it up to Andrew Shelton, and then she responded to a, Mr. Rich, President Rich came and got her about what she had reported to Andrew Shelton, and she reported it again, which is also protected activity under the Supreme Court's decision in Crawford versus, let's see, Union Metropolitan Government of Nashville. If you need the site on that, it's 555 U.S. 271. But with regard to the gap, I think that the way to look at the evidence, and the light most favorable to Starnes is, is that the types of intimidation conduct that was directed against her almost immediately after her reports had their effect. They had a chilling effect on her willingness to continue to participate in protected activity. They began to, first of all, they began to treat her differently and poorly, coolly. They began to strip her job duties away from her. They obviously changed her job description. They changed her supervisor. Mr. Rich was her supervisor up until approximately March of 2011. And at that time, Mr. Rich told her that you're not, I'm not going to be your supervisor anymore because you're too pretty for me to get on to. And so, that is. You have a red light, sir. Oh, I apologize. You have some time left for rebuttal. Thank you, sir. I recall you opened by saying you hoped to cover three things, but I'm sorry your hope was not fulfilled. Okay, Mr. McElhaney. Thank you, Judge Davis. Mr. Davis, may it please the Court, I'll just launch right into the issues that seem to be interesting to the Court, and that is, first of all, the issue of whether or not Ms. Starnes engaged in protected activity. Judge Schell correctly decided that she did not. The question is, under the Hagenberg Echo Star, did she step out of her role? You can look at the job description that the Court is focused on because the record shows it is dated October 25th of 2010. The record doesn't precisely delineate whether or not that date is before or after she went and talked to Mr. Shelton or talked to Mr. Rich, but there is no reason to doubt the date on the document. What was the reason she was given that new job description? I mean, it does seem awfully coincidental it happens the same month she reports this FLSA issue. Well, it's not really clear it's the same month. I'll admit that I don't know the exact time that Ms. Starnes spoke up to Mr. Shelton. I have a sense it was November, December afterwards. Now, that may be my biased reading of the record, but I don't believe there's a delineation. But to answer your question, Mr. Shelton did come in to, he was new to the HR position, and as, I think I set this out in my brief, he saw that there were some missing and out-of-date job descriptions. This was not the only new job description that was promulgated within the company. So this is not, it's not as though they picked on her and she's the only one who got new job descriptions. Mr. Shelton was working on new and updated job descriptions for other people because he found that there were some people misclassified, there were out-of-date job descriptions. The important thing about the job description. Is there evidence when he delivered the new job description to her? I don't believe there's any in the record that shows that, the delivery date. All we have is the October, excuse me, October 25 date of the description. Is there at least some evidence that it was some period of time, it had to be at least by a certain date? Is there any evidence like that? I mean, she signed it in March, you say it was dated October 25, it was dated October 25. Is there any evidence that at least by the end of the year she had it? Nothing like that in the record? Nothing in the record that would identify it any more than what we've talked about. The important point about the job description, though, is this. It requires or says that part of Ms. Starnes' duties are to report violations of the law. So when Ms. Starnes argues that, oh, well, it was Mr. Shelton who was the HR manager, he's the one tasked with compliance with the FLSA, sure, he may have been the one who would initially evaluate whether or not Mr. Estrada was properly classified or not. But that doesn't change the fact that part of Ms. Starnes' responsibilities were reporting allegations of violations of the law. That's precisely what she did here. It's within her job description. It's within her role as a . . . Are you showing that other than this issue with Estrada, she ever dealt with a single task involving wage and hours or the FLSA? No, I don't believe she ever did. As the Court noted, she did deal with Title VII issues. I'm not exactly sure whether or not there's a lot of other FLSA issues that have come up within the company. And so this is not something that she regularly did. But the point is that when there's an allegation that there is a violation of law, it is her job to report it, report it up to the chain of command. So you're assuming the new job description was in effect? Yes. I mean, there's no . . . Well, I suppose so, but there's also no evidence that this is a material change in her duties. There's no evidence that that's a change at all. When Ms. Starnes actually signed the agreement in March, there are no suggestions in the record whatsoever that she says, my gosh, this is new. I don't agree with this. I've never been doing this before. There's nothing like that in the record. Counsel, the problem, as I see it in this case, not necessarily insurmountable, is that we're dealing with this on summary judgment. You've talked about some of the things the record does not show. There is no job description predating these events, written job description, that shows this would have been her duties. As I understand it, Ms. Estrada doesn't say, I went to Starnes because I thought she was the right person to go to. Is that correct? Actually, that is incorrect. I would point to . . . I mean, that was the response here. I thought there was something in the record, but opposing counsel says not. There wasn't. Opposing counsel cited . . . Before you get to there, why don't you give me that answer? Of course. But it seems to me the problem, and again, you'll give me some more evidence, is that there do seem to be factual disputes and factual omissions. And so what we really need is clear evidence, read in the light most favorable to the other side, that makes this the indisputable result. So respond, including the fact that you want to tell me about. Sure. First of all, as to how the Court approaches this, we did move for summary judgment. It became Ms. Starnes' obligation to create a genuine issue of fact necessitating trial. Here, they're raising some speculation, some conjecture, some speculation, but they haven't carried their burden, and it's her burden to show that there's a genuine issue for trial. The Court may say there are some questions out there, but that was her burden to present enough evidence to Judge Schell to mandate a trial. Isn't there at least a dispute, the date of March of signing that document, no evidence on your part that her job included that? And there is an assertion on her part, is there not, that that was not part of her job, to be reporting FLSA? She said she never handled FLSA matters, so she may not have been deciding who's exempt or not exempt. I mean, isn't that gray area means that there's a dispute here about whether her duties included this and whether she was, in fact, stepping outside of her duties to report? Well, again, you have to, you can indulge inferences in favor of Ms. Starnes, but they have to be based on the facts, facts, and she didn't bring forth sufficient facts to show that, for example, the October 25 day of the job description was after she went and talked to Ms., excuse me, Mr. Shelton. That's her burden to have done that, and she didn't do it. And what does the record show as to why Ludi Estrada went to Starnes? Right. Mr., uh, opposing counsel cited Ms. Estrada's affidavit, but she also testified in her deposition, and it's in the record at page 935, it's page 259 of Ms. Estrada's deposition, that she went to, Ms. Estrada went to Ms. Starnes because she knew Ms. Starnes dealt with legal matters for the company. So that's in the record as well, so it's not as though, um, there is evidence that that is why Ms. Estrada went to Ms. Starnes. They may say there are other reasons as well, but what I just said is also in the record. Is there evidence that, uh, Estrada or Vinson went to anybody at HR? Um, I don't believe Ms. Estrada ever went directly to HR. After Ms. Starnes talked to HR, um, Ms. Estrada eventually talked directly with President Opposing counsel said, I understood him to say that there was something in the record about, uh, Estrada going to HR before she talked to, uh, uh, Starnes. Um, I don't believe so. Ms. Estrada did talk to her immediate supervisor, who is a treasurer, and the treasurer encouraged Ms. Estrada to go to HR, but before Ms. Estrada went to HR, Ms. Estrada went to Ms. Starnes. That's my understanding of the record. So the treasurer told her to go to HR? Correct. And instead, Ms. Estrada chose to go to, um, Ms. Starnes. And she's, and Ms. Estrada said in her deposition- Wouldn't that be some indication that the proper place to go was, uh, HR? Um, well, that would be one place to go. The point is that Ms., Ms., Ms. Starnes' job included reporting allegations of violation of law. And when Ms. Estrada did go to Ms. Starnes, part of her job is reporting the violation of law. So if anyone's job description is to report any federal, state, local law violation, I mean, that, that's a huge universe that has, anyone who owns a company knows how many regulations are out there and laws are out there. Um, most companies divide up, um, you know, different spheres of, of activity. Um, let me ask you, in Hagen, and we relied on McKenzie, that Tenth Circuit case, we noted that if you're actively assisting another employee, that is a type of protected activity. And so does it matter here that it wasn't as if, um, Starnes was sitting in her office one day looking at some paperwork and said, oh my gosh, I think we have an F, an FLSA problem, I'm gonna go tell the boss, I think we might have an issue here. I mean, she's doing this on behalf of a particular employee, not at her initiative. I mean, someone comes to her in the first place, um, why doesn't that put her within what we recognized as protected activity for actively assisting a particular employee? Well, I think the phrase in McKenzie and in Hagen was step outside your role by, for example, actively assisting. So, I don't think that necessarily, actively assisting isn't sufficient to create being, stepping outside your role. Just like Ms. Starnes, or even Ms. McKenzie in the Tenth Circuit case. Ms. McKenzie believed, um, the, the, there was a valid complaint, but that didn't mean she stepped outside her role. If the fact that Ms. Starnes here did go talk to Mr. Shelton, um, in a sense that might be actively assisting, but that doesn't mean she's stepping outside of her role when her role is to report allegations of violation of law. And this isn't something that's totally foreign to something she does. She's a risk manager for the company. She manages risk. You, oftentimes that's, uh, workers' comp claims and things like that. It's certainly EEOC and Title VII type claims. This isn't something wholly foreign to her line of work. Let me, I mean, you, you, you correctly noted the whole issue is that she's stepping outside of her role. Let me ask you about something else, and if it's relevant to that question. When this all ultimately comes to a head and, and Estrada ends up getting paid, there's that meeting in late 2011, where Rich, um, according to Ms. Estrada, we have to take that as true, is really upset and he's blaming Starnes, he's saying it's her fault, we're all into this, um, isn't that evidence that she did step out of her role? Why would someone be so upset and voicing that anger, um, if someone's just doing their job? I mean, the whole issue is, is she positioning herself as adversarial to the company, right? And doesn't that indicate she was? No, I think, I think what she, what, the, the conversation between Ms. Estrada and Mr. Rich, my recollection of the record was that Mr., there's, there's testimony that Ms. Estrada believed that Mr. Rich was hostile, but what she testified actually happened was that they're discussing how much overtime needed to be paid, and there's obviously some sort of disagreement over what's compensable travel time. Mr. Rich says, I don't know where, you know, you're getting these, I don't, I don't know where you're getting these, these wacky ideas, and then points at Ms., uh, Ms. Starnes's office. Well, that shows, perhaps, that. He said she was to blame, I think that's what Estrada said. True or not? Um, okay. Well, I don't think I saw. Why is she to blame for this? Well, when her job is, when Ms. Starnes's job is to be the messenger, she's still not necessarily stepping out of her role, and I think that's the fundamental point. I mean, sometimes higher-ups don't like to get bad news, but that doesn't mean it isn't the responsibility of someone whose job it is to report potential violations of law, that that's their job to do it. It's part of, it is part of the job. It doesn't change the fact that she's not stepping outside of her job. I think what your, your question, Judge Costa, gets at is another, the other element that Judge Schell noted that showed that Ms. Starnes failed to prove a prima facie case, and that's the, there's no prima facie case of causation here. There is a long time gap between the late 2010 alleged protected activity and the January 2012 decision, or implementation of the decision to eliminate her position, and under the Supreme Court's case in Clark County v. Breeden, and this Court's case in Rags, and the more recent unpublished decision from this Court in Flanner, which is in my brief, that time gap is too long for there to be any inference of a causal connection. But time, that's how plaintiffs often try to prove causation for the prima facie case, but it's not the only way they can do so, and here, if you accept, I know you don't, but if you accept District Judge Schell's ruling on pretext as to Ms. Estrada saying the layoffs were pretext, or at least there's a fact issue on that, because, I mean, that would seemingly just as much apply to Starnes, and pretext is the ultimate causation inquiry. So our case law does say you can look at that pretext evidence as part of the prima facie case. Right. There's two things to say about that. First of all, it presupposes that Rich is involved in the decision-making, and if you actually, when you look at the record, you see that the argument that Ms. Starnes is making really doesn't hold up, and I can explain why. The deposition testimony of Mr. Wallace is clear, it's on page 1001, that's his deposition testimony. It said he made the decision to identify Ms. Starnes' position as one that can be eliminated, and there's also no question that he had no idea about Starnes' involvement in the Estrada matter. That deposition was on June 4th of 2013. The next day, Mike Rich testifies in his deposition, he explains the same thing. Ultimately later in 2011, we had Medicare reimbursement cuts, we had to eliminate jobs, Mr. Wallace decides to eliminate Ms. Starnes' position. Now, what happens next, that's in June. What happens next is the interrogatory answer, and that's what Ms. Starnes relies on to show that there's a fact issue about Rich's involvement. The interrogatory isn't for two months later, you've already had the deposition testimony. The interrogatory asks who participated in the decision, and who made the final, ultimate decision. The answer, frankly, didn't answer the question very well, it just had a list of names. And that interrogatory answer is two months after this deposition testimony. When you go back and look at the pages surrounding the deposition testimony, and again, Mr. Wallace is at 1001, Mr. Rich's deposition is at page 1048, you see that what happened was the senior leadership of Daybreak got together and decided on several positions to eliminate. They all discussed the elimination of those positions, but there's no question that Mr. Starnes' position can be eliminated. And that's why Mr. Wallace was the decision-maker here. That cuts off even a prima facie case of causation. As to pretext, yes, Judge Casso, we think that we should have won summary judgment for Ms. Estrada as well, because when Judge Schell found pretext, he looked only at the layoff decision and said, oh, look, other people were rehired. But as I tried to explain in my brief, the record shows exactly why, and the record also casts no doubt on the fact that Ms. Starnes' position was eliminated and no one was rehired to replace her. The other people whose jobs were eliminated, their jobs were eliminated. They were out of work. But Daybreak found they couldn't live without two of the people. There's Ms. Foster, who was a benefits clerk, and they were getting way behind in their benefits paperwork even before open enrollment came around. And also, there's a benefits clerk, excuse me, there's an AR clerk, and they realized that they needed someone who knew the AR system. They ultimately rehired those two. And there's a third person whose job was eliminated, who was Josh Rich, the son of Mike Rich. But even the announcement of the elimination of his job noted that he had already transitioned to work for a vendor. So when you look at the explanation that's there, we think Judge Schell really should have granted summary judgment for Daybreak on Ms. Estrada's claims as well. So when you look at the record and see how it developed, the notion that this interrogatory answer creates some sort of fact issue as to Mr. Rich's involvement really disappears when you look at the context of how the deposition testimony came out. Then there's this interrogatory answer that they point to, but it really doesn't answer the question. And when you look at the entire context of how discovery occurred, you see there's really no fact issue there. You were just talking about, when were the layoffs actually planned? I know they happened in early 12. Right. Excuse me. I'm sorry. I'm just talking over you. They were discussed in November and December of 2011. And so that's when... With names, or just that there were going to be layoffs? There is evidence of particular names. I believe it's around, like, in the 1,000, 80s, or I think, in the record, if you look at the summary judgment, look at the summary judgment record, there's a bunch of exhibits. There are a bunch of emails. They're all from November and December, and they're discussing... At first, there's about 11 names. Eventually, it gets whittled down to the five whose jobs were eliminated. So there is discussion in November and December, mostly, I think, November, early December of 2011. And again, this immediately follows the implementation of the CMS reimbursement cuts for Medicare... Medicare reimbursement cuts for nursing homes. There's a dramatic loss of revenue for Daybreak. There are layoffs out in the nursing homes. There also are going to be job eliminations at the home office. Didn't I see somewhere that Rich actually signed the termination letters? Yes. The only termination letter in the record is actually Mrs. Strada's, but that just shows the point that he just signed them all. And so it really doesn't have... Did he sign her termination letter? I believe so. Her termination letter is not in the record, but I think the testimony is he signed them all. Well, he... I mean, he was fully aware of it then. I mean, I... Oh, so... Correct. There's no question... He was involved in the decision. Well, there's no question that he was aware. I mean, it was a group discussion amongst the senior leadership. But there's also no question that the person who identified Ms. Starnes' position for elimination was Mr. Wallace, and there's also a question that he didn't know about any involvement. I only have about a minute left. Hopefully, the Court need not address the emotional distress issue, but I do want to touch on it. I believe that this Court's decision in Dean, where this Court construed exactly the same verbiage that's in the ADEA, that is in the FLSA, to not allow for emotional distress damages really still pertains, and this Court really has to, I think, believe it's bound to follow the Dean panel to find that... How do you get around the fact that Dean really relied, I think, primarily on the reconciliation process, the administrative provisions that don't exist? Right. It still interpreted the same verbiage, and I think there's one other point that I tried to make in the brief, and that is this, is that when you have a description of a remedy and a listing of examples, courts can expand that list of examples to other things, but they have to be of the same character. When you have employment reinstatement promotion, you have employment compensation-based remedies. One case I didn't cite in the brief, it shows the exact same analysis, is U.S. v. Philip Morris. It's at 396 F. 3rd, 1190, and at page 1,200, it explains that precise principle in the RICO has allowed certain equitable relief. It describes certain particular types of equitable relief, and the issue in that case is that this is when the federal government sued the tobacco industry and wanted discursion of profits, and the D.C. Circuit said that the types of equitable relief listed describe the character of the relief that can be granted beyond just what's in the list, and when, since in that case, disgorgement was different in character than the types of relief that were actually listed, principles of statutory construction show that a court can't expand the list beyond the types that are listed. Here the FLSA just lists employment compensation-based remedies, like employment promotion. That's fundamentally different in character than emotional distress damages, and that's why the other courts, for example, the 6th and 7th Circuit, who said emotional distress damages are available, they went too far. They weren't cabined by the rules of statutory construction that the D.C. Circuit applied. You see my time is up. Thank you for your indulgence. Okay. Back to you, Mr. Fillmore. Judge, I need to address, first off, the concept that Rich is not involved in the decision is critical for daybreak because they lose on causation if he is involved. This is the same man who, as the Court has noted, pointed out or signed all the termination letters who had the December 9 showdown with Ludi Estrada, who negotiated the private settlement with the Estradas of the FLSA claim, who is identified as a final decision-maker in sworn interrogatory answers, who is identified as a decision-maker in a current pleading admission that they have judicially admitted and are bound by the concept that Michael Rich was a part of the people who decided to terminate Leanne Starnes and Ludi Estrada. So I don't believe that they should be allowed to disavow that, as they have been able to disavow other pleading admissions. And I would also point the Court to this document in the record. It's ROA.1101. It's a memorandum or an email sent by Mike Rich to a number of people which mentions the what he calls job deletion slash layoffs. And he says in this email, I want to make these changes effective January 1st. Not Mike Wallace. I want to make these changes effective January 1st. And so what the Court is left with here with regard to daybreak's argument that Mr. Rich didn't participate in the decision, they simply cannot keep their story straight. And that is another reason why summary judgment is inappropriate in this case. With regard to protected activity, there is evidence in the record as to when these job descriptions came into being, and it was after Leanne reported, after Ms. Starnes reported. But if the Court looks at the admissions made by daybreak to paragraph 52 of both plaintiff's original complaint and plaintiff's first amended original complaint and compares, that would be ROA.28, ROA.103 compared to ROA.79 and ROA.171, here's what daybreak admitted to. After speaking with Starnes, Shelton sent a memo to various department heads requesting the departments to turn in job descriptions of their employees after speaking to Starnes. And so the job description process did not begin until after speaking with Starnes, and that's the evidence in the record, and in a light most favorable to Starnes, that is, again, shows her advocacy was effective. Now, with regard to the issue of the old job description, I believe one of you, I think it was you, Justice Davis, mentioned the fact that you didn't think there was an old job description. There is an old job description. That job description is found at ROA 8.859 to 860, maybe, hold on, .858 to 860. If you compare the old job description to the new job description, it's a substantial increase, a substantial change in her job duties. And so her role was greatly changed with this new job description. Now with regard to the old job, I mean the new job description, it has a revised date of 10-25-2010. Now, obviously, there is no evidence in the record to establish this as the real date other than it's just, it speaks for itself, but if we're going to indulge any inference, it should be indulged in Starnes' favor, and they have admitted that these job descriptions did not begin to be formulated until after Starnes had spoken with Andrew Shelton. But the other thing is, is that there is no evidence in the record of Leanne Starnes being aware of the existence of this job description until she signed it in March of 2011. There's no evidence in the record of a meeting . . . Was her deposition taken? Yes, sir, it was. She didn't pin that down at all? I don't believe, I don't believe there is any evidence that the defendant has attached to its motion for summary judgment that is a part of this record that Leanne Starnes was aware of this job description prior to the date she signed it. She didn't say she was or wasn't or what? I cannot recall. I cannot recall. But the evidence in this record does not show anything. And so, there is a significant difference in the two job descriptions, and as this Court has noted, there is a dispute as to the scope of her job duties, and we would ask that emotional distress damages be allowed under the FLSA. I see I'm out of time. I respectfully submit it.